**EDWARD HINES LUMBER COMPANY, Plaintiff,**

v.

**VULCAN MATERIALS COMPANY, Monsanto Company, Osmose Wood Preserving Company of America, Inc., Bernuth Lembcke, Reilly Tar & Chemical Company, Allied Chemical Corporation, Crown Zellerback Corporation, Joc Oil Exploration Company, Inc., USX Corporation and Koppers Company, Inc., Defendants.**

No. 85 C 1142.

United States District Court,
N.D. Illinois, E.D.

Aug. 31, 1987.

Robin R. Lunn, Maureen Martin, Robert K. Neiman, Keck, Mahin & Cate, James J. Hofert, Robert C. Farrar (Vulcan), French, Rogers, Kezelis & Kominiarek, Chicago, Ill., for plaintiff.

John W. Roberts (Monsanto), Kirkland & Ellis, Alan I. Becker, Daniel G. Litchfield (Bernuth), Burditt, Bowles & Radzius, Steven Mahoney (Osmose), Heineke, Burke & Healy, H. Roderic Heard, Robert L. Suftan, Carol J. Gerner, Michael R. Blankshain, Robert M. Collins (Reilly/Allied/USX/Koppers), Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This action concerns the potential liability of the defendants Osmose Wood Preserving Company of America, Inc. ("Osmose"), Bernuth Lembcke ("Bernuth"),

Reilly Tar & Chemical Company, Allied Chemical Corporation, USX Corporation and Koppers Company, Inc. (collectively "Reilly"),[1] under state common law negligence and product liability theories as well as under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9675 (West 1983 & West Supp. 1987), arising from the sale of certain chemicals to plaintiff Edward Hines Lumber Company ("Hines") for use at Hines' wood treating plant in Mena, Arkansas. Currently pending are various motions by the defendants for dismissal of Hines' complaint. The primary basis for dismissal asserted by the defendants is the statute of limitations, an issue which they have characterized as a relatively simple one which will dispose of all issues in the suit through their summary judgment motions, which we address herein. For the following reasons, the defendants' summary judgment motions are granted as to the negligence and product liability counts in Hines' complaint, and we dismiss those counts with prejudice.[2]

This suit began in an Illinois state court, where Hines filed its original complaint against Vulcan on December 21, 1984. Hines first sued only Vulcan, seeking recovery for property damage resulting from toxic chemicals sold to Hines by Vulcan. On February 6, 1985, Vulcan filed a petition for removal to this Court based on diversity of citizenship, 28 U.S.C. § 1332 (1982). Subsequently, the other defendants were named as third-party defendants in a third-party complaint filed by Vulcan and as direct defendants in Hines' amended complaint filed on October 16, 1986.

## I. UNDISPUTED FACTS [3]

From 1967 until 1978, Hines, a Delaware corporation, owned and operated a wood

**1.** Five other defendants, Vulcan Materials Co., Monsanto Co., Crown Zellerbach Corporation, JOC Oil Exploration Co., Inc. and Western Tar Products Corporation, have been voluntarily dismissed from this action.

**2.** We reserve judgment on defendants' motions as to the declaratory judgment counts, Counts VI and IX.

**3.** The following facts have been drawn from the pleadings, exhibits, affidavits, deposition transcripts and Local Rule 12 statements submitted by the parties in conjunction with their various

treating facility in Mena, Arkansas ("the Mena site"). The defendants all allegedly sold chemicals to Hines which the latter used at the Mena site in the course of its wood-treatment processing, and it is the use of these chemicals which is alleged to have caused damage to Hines' property. Vulcan and Monsanto sold pentachlorophenol ("penta"), Bernuth and Reilly both sold creosote, and Osmose sold chromated copper arsenate ("CCA"). During the period in which Hines owned and operated the Mena site, it used a holding pond for "process runoff" or waste from the wood treating process. In 1978, Hines sold the Mena site to another person who is not a party to this action. Because of its potential liability for environmental damage caused by past conduct, however, Hines filed the present action seeking relief in the form of "reimbursement" for expenses which it may incur if forced to pay for a clean-up of the Mena site.

Counts IV and VII of Hines' nine-count complaint allege that in selling their wood treating chemicals to Hines, the defendants were negligent in the manufacture and sale of their respective chemicals due to their failure to test and inspect the chemicals to insure safe use, to instruct purchasers regarding conditions and methods of the chemicals' safe use and to warn the users of the dangers associated with the chemicals. In Counts V and VIII, Hines alleges that the defendants are strictly liable for the sale of their respective chemicals because they supplied those chemicals to Hines in a defective condition which rendered them unreasonably dangerous and that Hines suffered injury proximately caused by that condition. Finally, in Counts VI and IX, Hines alleges that it has incurred damages which are ongoing and will continue into the future and requests a judgment declaring that any future damages it incurs as a result of environmental damage at the Mena site must be reimbursed by the defendants. The defendants seek summary judgment dismissing Hines' common law counts premised on the relevant statutes of limitations.

## II. SUMMARY JUDGMENT ON THE STATUTE OF LIMITATIONS

Summary judgment is appropriate only where the moving party demonstrates that no genuine issue of material fact exists and that it is accordingly entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the burden of clearly establishing the absence of a triable fact issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Furthermore, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 460 (7th Cir. 1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987). With these standards in mind, we turn to the issues at hand.

■ The threshold determination we are called upon to address is the applicable statute of limitations for the common law counts. In the present case, that task entails not only deciding between different limitations statutes within one state, but also the determination of which state's statutes apply. As a general principle, a federal court sitting in a diversity action applies the choice of law rules of the state in which it sits. *See Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In Illinois, state courts must follow the Illinois borrowing act when considering causes of action which arose outside of Illinois borders. The borrowing act provides that:

> When a cause of action has arisen in a state or territory out of this State, or in a foreign country, and, by the laws thereof, an action thereon cannot be maintained by reason of the lapse of time, an action thereon shall not be maintained in this State.

Ill.Rev.Stat. ch. 110, ¶ 13–210 (1985). As articulated by Judge Shadur in *Williams v. Fulton County Jail*, 575 F.Supp. 306, 308 (N.D.Ill.1983), the borrowing act boils down

motions. Furthermore, more detailed factual discussions are contained throughout this opinion, and citation to the record is made accordingly.

to two statutory inquiries: (1) Did the cause of action arise outside of Illinois?; and (2) would the cause of action be time barred under the law of the state where the suit arose?[4] In this case, there is no question that the cause arose in Arkansas, the location of the allegedly damaged property, the Mena site, and the place where all the chemicals sold by the defendants were used by Hines.[5] The second part of the inquiry concerns the comparative lengths of the Illinos and foreign state limitations periods. Generally, the foreign state's limitations period is "borrowed" only if it is shorter than that of the forum state. *Williams*, 575 F.Supp. at 308 n. 3. Because the foreign state in this case is Arkansas, we must compare the relevant statutes of limitations in that state and Illinois.

With respect to Hines' claims of negligence in the defendants' sales of their respective chemicals, the relevant statutes of limitations are Ark.Stat.Ann. §§ 27–901, 37–206, *Schenebeck v. Sterling Drug Co.*, 423 F.2d 919, 924 & n. 3 (8th Cir.1970), which provides a three-year period for bringing negligence claims, and Ill.Rev. Stat. ch. 110, ¶ 13–205 (1985), which prescribes a five-year limitations period in actions involving damage to real property. Since the borrowing act mandates application of the shorter period, *Williams*, 575 F.Supp. at 308 n. 3, the choice is quite simple regarding the negligence claims in Counts IV and VII and, accordingly, we will apply the Arkansas three-year period set forth in § 37–206.

▪ The timeliness of the strict product liability claims pled in Counts V and VIII is governed by either the Arkansas limitations statute for product liability suits, Ark.Stat.Ann. § 34–2803, or by the Illinois

statute regulating actions for injury to real property, Ill.Rev.Stat. ch. 110, ¶ 13–205 (1985). The parties appear to have misinterpreted the Illinois product liability limitations statute as creating a two-year period in which such actions may be maintained in this state, *see* Ill.Rev.Stat. ch. 110, ¶ 13–213 (1985), but it is readily apparent that ¶ 13–213 merely creates a procedural overlay to be grafted on to existing limitations statutes depending on the nature of the injury caused by the allegedly defective product. *LaPorte v. R.D. Werner Co., Inc.*, 561 F.Supp. 189, 190–91 n. 3 (N.D.Ill. 1983); Albers, *Statutes of Limitations in Illinois Strict Products Liability Suits*, 74 Ill.B.J. 586, 586 & n. 1 (1986) (hereafter "Albers"). Notwithstanding that ¶ 13–213 establishes certain timeliness requirements for product liability actions, including a statute of repose and a discovery rule, it also clearly states that no strict product liability action shall be commenced "within the *applicable* limitations period." Ill.Rev. Stat. ch. 110, ¶ 13–213(b) (1985) (emphasis added). Thus, the adoption of ¶ 13–213 did nothing to alter the existing limitations periods for different types of injuries, so that a personal injury suit premised on strict product liability must be brought within two years, Ill.Rev.Stat. ch. 110, ¶ 13–202 (1985), and a similar suit for damage to real property must be filed within five years, Ill.Rev.Stat. ch. 110, ¶ 13–205 (1985). *See* Albers at 586 n. 1 ("In an action for property damage under a strict liability theory the court applies ¶ 13–205 within the confines of Ill.Rev.Stat. ch. 110, ¶ 13–213 (1983).").

Having waded through this minor exercise in statutory interpretation, we conclude that the Arkansas limitations period for product liability actions, Ark.Stat.Ann.

---

**4.** By judicial construction, the borrowing statute is applied only in cases where the parties were not Illinois residents when the cause of action accrued. *Williams*, 575 F.Supp. at 308. This exception grows from the underlying policy of the borrowing act, which is to deter forum shopping by non-resident plaintiffs seeking longer limitation periods than the ones in the state where the action accrued. *Miller v. Lockett*, 98 Ill.2d 478, 486, 75 Ill.Dec. 224, 228, 457 N.E.2d 14, 18 (1983). For the purposes of this rule, a corporation is considered to be a resident only

in its state of incorporation. *Hollins v. Yellow Freight System, Inc.*, 590 F.Supp. 1023, 1026 (N.D.Ill.1984). Hines alleged in its amended complaint that it is a Delaware corporation and there is no indication in the record that any of the defendants is incorporated in Illinois. Accordingly, the Illinois resident exception to the borrowing statute is not applicable here.

**5.** The propriety of venue in this district has not been challenged by any of the defendants.

§ 34–2803, applies to Hines' complaint since it is shorter than the five-year period allowed under the Illinois real property damage statute. Because § 34–2803 provides a three-year statute of limitations, the same period which limits negligence actions in Arkansas, the timeliness of the bulk of Hines' complaint must be measured against that time frame.[6]

As stated previously, Hines' original complaint was filed on December 21, 1984. Accordingly, if Hines had knowledge from which a reasonable person would have determined that a cause of action existed before December 21, 1981, its action is barred by the Arkansas statutes of limitations.[7] Under Arkansas law, the statute of limitations on a claim for negligence and/or product liability begins to run when the negligent damage occurs, not from the time the full extent of the injury is ascertained. *Spickes v. Medtronic, Inc.,* 275 Ark. 421, 631 S.W.2d 5, 6–7 (1982). Furthermore, "the limitations period can begin running if the manifested damage, even if slight, reveals the nature of the injury." *Mulligan v. Lederle Laboratories,* 786 F.2d 859, 864 (8th Cir.1986) (emphasis added).

■ The thrust of the defendants' arguments in this case is that numerous events which occurred well before December 1981 either put Hines on notice or should have put Hines on notice that penta, creosote and CCA were all chemicals with potentially hazardous environmental effects. In its defense, Hines contends that although it was aware of certain dangers related to the use of these chemicals with respect to the environment *surrounding* the Mena site, it was unaware of their potential contamination of the Mena site itself. After thoroughly examining the record in this case, we find that there were a number of undisputed key events which should have made a reasonable person aware well before December 1981 of the potential damage accruing from the use and disposal of these chemicals.

As early as the latter part of 1971, Hines was involved with the State of Arkansas in matters concerning the waste produced at the Mena wood treating facility. In September 1971, Hines officials met with staff members of the Arkansas Department of Pollution Control and Ecology ("DPC") and discussed concerns about the volume of discharge water, its toxicity and the possible overflow related to the waste. Peek Exh. 11 (Monsanto Appx.).[8] Mike Peek, Hines' general manager at the Mena site, then sought authorization to expend funds for pollution control at the site and submitted an application to the state for per-

---

6. None of the parties even mentioned the possible effect of Ill.Rev.Stat. ch. 110, ¶ 13–213(g) (1985), which states that the Illinois product liability limitations statute applies only to actions accruing "on or after January 1, 1979." Previously, Illinois had a two-year limitation period for product liability actions. *See* Albers at 587 n. 4 (citing Ill.Rev.Stat. ch. 82, § 15 (1961)). If the old statute did apply, we would not borrow the Arkansas statute because the relevant Illinos period would then be shorter. Nonetheless, as discussed in the text of this opinion, Hines was, or should have been, on notice more than three years before its original complaint was filed, so even if ¶ 13–213(g) barred application of the present statute, the outcome of the defendants' motions would be no different.

7. Some of the defendants not named in Hines' original complaint have argued that the amended complaint naming them as direct defendants does not relate back to the date of the original complaint so that the applicable statutes of limitations should be measured back from the later date. Fed.R.Civ.P. 15(c). Because, as discussed in this opinion, we find that Hines' complaint on the negligence and product liability counts is untimely even if the amended complaint did relate back to December 21, 1984, we need not broach this issue.

8. Because of the voluminous exhibits submitted to the Court and considered in ruling on the current motions, we cite to exhibits, affidavits, deposition transcripts, etc., both by number and by the documents in which they were contained. The following abbreviations apply throughout this opinion: (1) "Monsanto Appx."—Appendix to Monsanto's Reply Memorandum in Support of Summary Judgment Against Plaintiff's State Law Claims; (2) "Vulcan Appx. I"—Appendix in Support of Defendant's, Vulcan Materials Company's, Reply Memorandum (Feb. 3, 1987); (3) "Vulcan Appx. II"—Appendix in Support of Defendant's, Vulcan Materials Company's, Reply Memorandum (April 30, 1987); (4) "Hines Appx."—Appendix to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment.

mission to construct and operate a treatment plant to reduce the chemical content of waste water prior to its discharge into Arkansas waters. Peek Exhs. 12, 18 (Monsanto Appx.).

Moreover, several important Hines' officials were aware of the toxic nature of the chemicals sold by the defendants for use at the wood treating plant. O.D. Hale, the Hines' Mena plant superintendent between 1970 and 1973, understood at the time of his employment that the wood treating chemicals could kill vegetation, were toxic to fish and could cause stream pollution upon discharge. Deposition of O.D. Hale, Volume I ("Hale Dep. I") at 28–29, 109 (Vulcan Appx. I). Robert Hugus, who worked for Hines at Mena in various managerial capacities on and off between 1972 and 1978, was aware as early as 1972 that there was a pollution problem with the holding ponds and that they should be cleaned or eliminated. Deposition of Robert L. Hugus ("Hugus Dep.") at 22–24, 32–33, 71 (Vulcan Appx. I). Furthermore, Peek testified at his deposition that the toxic characteristics of the chemicals were one reason they were used in wood treating since the toxicity prevented infestation of the wood by termites, fungi and mold. Deposition of Mike Peek ("Peek Dep.") at 210–14 (Monsanto Appx.). Peek understood the toxic nature of penta, creosote and CCA at the time he became Hines' general manager at Mena. Peek Dep. at 211.

Another significant event which should have put Hines on notice that there were serious problems with its holding pond was a "fish kill" which took place on or about November 2, 1976. This incident involved the release of holding pond water into a stream adjoining the Mena site and resulted in the death of fish for several miles downstream. Hines' Response to Request to Admit, No. 13 (Vulcan Appx. I). The Arkansas Game and Fish Commission cited and fined Hines for this accident, and the Arkansas DPC ordered Hines to cease and desist polluting the surrounding environment with effluent waste from its wood treating facility. Hines' Response to Request to Admit, No. 15 (Vulcan Appx. I);

Vulcan's Brief in Support of Motion for Summary Judgment, Exh. A. In addition, the DPC directed Hines to submit final plans and specifications for construction of a disposal system to abate the pollution caused by the holding pond waste. Arkansas DPC Directive, Dec. 16, 1976 (Vulcan Appx. I), Vulcan's Brief in Support of Motion for Summary Judgment, Exh. A. Preliminary plans had already been considered at that point, and L.V. Russell, a consulting engineer, had been engaged by Hines to undertake such a project. Russell had concluded as early as December 1, 1976, that the holding pond water was highly toxic and recommended to Hines shortly thereafter that the pond be eliminated. Deposition of L.V. Russell, Volume I ("Russell Dep. I") at 79–80 (Monsanto Appx.). He had written in a letter dated June 9, 1977, that the highly toxic pond water would be a hazard "until it is completely treated." Russell Dep. I at 79; Russell Exh. 105 (Monsanto Appx.). Moreover, Hugus was concerned at this time that a plan be implemented to clean up the pond, remove all liquid hazardous materials and examine the remaining residue at the bottom of the pond, "plus what might have been absorbed on the sides into the earth." Hugus Dep. at 82–83.

In 1978, Hines closed down the Mena site and buried the holding pond. Hines then sold the property to Dale Rodgers pursuant to an agreement entered on September 18, 1978. The sales agreement included a term which protected Rodgers from liability for future damages incurred resulting from the holding pond. That term provided:

Hines shall indemnify Buyer [Rodgers] of and from any liability for pollution flowing from the pond area which is caused by materials deposited therein or thereon by Hines or its predecessors in title for a period of two years from the closing date of this agreement. From and after said two year period, Buyer shall assume full responsibility and indemnify Hines for liability for any pollution from said filled in pond area.

Exhibits (Vulcan Appx. I). It would appear that this provision is a manifestation of

Hines' then-present concern with continuing environmental problems resulting from the wood treating chemicals remaining in the holding pond as well as its understanding that certain costs might have to be incurred by the new owner relating to decontamination of the Mena site. Moreover, the Mena plant was valued on Hines' books at $425,000 at the time of sale. Deposition of Howell H. Howard ("Howard Dep.) at 119 (Vulcan Appx. II). Thus, the sale price of $315,000, approved by Edward Hines "even though it is less than the previous *low* figure determined by the Board," Brodl, Exh. 13 (emphasis added) (Monsanto Appx.), reflected the reduced value of the property due to the presence of the holding pond.

Moreover, Hines' inclusion of the liability protection clause in the sales agreement turned out to be rather prescient. On or about March 28, 1979, Hines' agents met with representatives of the Mid-South Lumber Company [9] to discuss methods of eliminating pollutants at the Mena site, including creosote and penta, in order to comply with Arkansas DPC directives. Hines' Responses to Request to Admit, Nos. 27, 28 (Vulcan Appx. I). Thus, even after the site was sold to Rodgers, Hines was on notice that environmental damage resulting from its use of the wood treating chemicals was a continuing problem.

Notwithstanding this extensive history of environmental problems with the Mena site which were clearly related to the use of the three relevant wood treating chemicals, Hines maintains that it was not on notice that it was being damaged by the conduct of the defendants which might subject them to liability in negligence or strict products liability. Indeed, rather than disputing the occurrences described above, Hines responds that it was not aware that the containment of the waste on its property in Mena would cause damage to the property and that by constructing a holding pond and attempting to treat the waste it was merely following the state's directives to prevent such waste from entering sur-

face waterways near the Mena site. Furthermore, Hines maintains that it was told by the state and by Monsanto that use of holding ponds was the proper waste handling method at the Mena site. We find this argument to be non-responsive to the defendants' well-supported assertion that Hines was on notice that the chemicals used in its wood treating process were toxic and could cause substantial damage to property. Indeed, it is difficult to see how Hines could concede its awareness that discharge of untreated waste water into the waterways surrounding the Mena site could result in environmental pollution while professing its "reasonable" ignorance of the potential harm these same chemicals would exact on its own property and the underlying ground water.

As set forth in both *Spickes v. Medtronic, Inc.*, 275 Ark. 421, 631 S.W.2d 5, 6–7 (Ark.1982), and *Mulligan v. Lederle Laboratories*, 786 F.2d 859, 864 (8th Cir.1986), a party need not have complete knowledge of the full extent of the damages for which it seeks legal relief in order for the statute of limitations to begin running. So long as the negligent damage has occurred, *Spickes*, and it reveals the nature of the injury, *Mulligan*, the plaintiff is considered to be on notice for the purposes of Ark. Stat.Ann. § 34–2803. The *Mulligan* court observed that the moment of accrual of the limitations period under § 34–2803 should be evaluated in light of the "plaintiff's awareness of his or her condition, including both the fact of the injury and the probable causal connection between the injury and a product's use." 786 F.2d at 864 (citing *Schenebeck v. Sterling Drug Co.*, 291 F.Supp. 368 (E.D.Ark.1968), *aff'd*, 423 F.2d 919 (8th Cir.1970), with approval). As described above, an ample number of incidents occurred between 1971 and 1978 which should have alerted Hines that some type of environmental damage had occurred to the Mena site and that it resulted from use of the wood treating chemicals.

**9.** Although Dale Rodgers is the only signatory to the sales agreement as the "buyer," Rodgers was apparently affiliated with the Mid-South Lumber Company, to which reference is made in the record regarding the succeeding ownership of the Mena site.

■■ Hines' fallback argument is that, at least with respect to its negligence and product liability claims, it could not have been aware of its damages earlier than now because it has not yet incurred any response costs resulting from federal action on the Mena site. That is, according to Hines, this suit is, if anything, premature. This contention carries little force and even less logic. Any *property damage* for which common law liability under traditional tort doctrine might ensue has already occurred. Hines sold the Mena site back in 1978 and, as the defendants have pointed out, any damage to the real property would have manifested itself in the diminished value of the sale price as measured against the contemporaneous market value. *See, e.g.*, Brodl Exh. 13 (Monsanto Appx.); Howard Dep. at 119–20. Furthermore, additional damages potentially attributable to past negligence or product liability of the defendants were incurred when Hines was forced to pay additional costs pursuant to its agreement to indemnify Rodgers for two years after the Mena site sale. With respect to any damages regarding future liability for response costs under CERCLA, as we discuss below, if those costs are recoverable, recovery must be exclusively under federal statutory and common law principles. Accordingly, the defendants' summary judgment motions on the negligence and product liability counts must be granted even in the absence of any prospective response cost liability to which Hines may be subjected, so long as Hines should have reasonably known that its property had been damaged by the defendants' conduct prior to December 1981.

The facts as set forth in the preceding discussion are essentially undisputed, and, accordingly, there are no genuine issues of material fact respecting the statute of limitations issues. In concluding that summary judgment is appropriate in the present case, we hold that no reasonable jury could find, based on the facts in the record, that Hines reasonably was not on notice well before December 21, 1981, that there was damage to its property and that a causal relationship existed between the defendants' chemicals and that damage. We

reach this conclusion even reading the facts in the light most favorable to Hines, as we are bound to do in evaluating the defendants' summary judgment motions, *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 460 (7th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987).

### III. CONCLUSION

In accordance with this opinion, the Court hereby enters summary judgment for the defendants on Counts IV, V, VII and VIII, Hines' claims for relief under the common law theories of negligence and strict liability, on the basis that the statute of limitations has run as to past damages suffered by Hines. It is so ordered.