LOUISIANA–PACIFIC CORPORATION; Port of Tacoma, Plaintiffs–Appellees,

v.

ASARCO INCORPORATED, Defendant–Third–Party Plaintiff–Appellant,

v.

William FJETLAND; B & L Trucking and Construction Co., Inc.; Industrial Mineral Products, Inc.; Murray Pacific Corporation; Portac, Inc.; Cascade Timber Company; Executive Bark Inc.; Wasser & Winters Company; Eagle Trucking, Inc., Third–Party Defendants–Appellees.

LOUISIANA–PACIFIC CORPORATION, Plaintiff,

v.

CASCADE TIMBER COMPANY, Third–Party Defendant–Counter–Claimant–Appellant,

v.

ASARCO INCORPORATED, Defendant–Third–Party Plaintiff–Appellee,

v.

William Fjetland; B & L Trucking and Construction Co., Inc.; Industrial Mineral Products, Inc.; Murray Pacific Corporation; Portac, Inc., Third–Party Defendants.

LOUISIANA–PACIFIC CORPORATION; Port of Tacoma, Plaintiffs,

Portac, Inc., Third–Party Defendant–Counter–Claimant–Appellant,

v.

ASARCO INCORPORATED, Defendant–Third–Party Plaintiff–Appellee,

William Fjetland, et al., Third–Party Defendants.

LOUISIANA–PACIFIC CORPORATION; Plaintiffs,

v.

MURRAY PACIFIC CORPORATION, Third–Party Defendant–Counter–Claimant–Appellant,

v.

ASARCO INCORPORATED, Defendant–Third–Party Plaintiff–Appellee,

William Fjetland; B & L Trucking and Construction Co., Inc.; Industrial Mineral Products, Inc., Third–Party Defendants.

LOUISIANA–PACIFIC CORPORATION;
Port of Tacoma, Plaintiffs,

Wasser & Winters Company, Third–
Party Defendant–Counter–
Claimant–Appellant,

v.

ASARCO INCORPORATED, Defendant–
Third–Party Plaintiff–Appellee,

William Fjetland, et al., Third–
Party Defendants.

LOUISIANA–PACIFIC CORPORATION,
Plaintiff,

and

Port of Tacoma, Plaintiff–Appellant,

v.

ASARCO INCORPORATED, Defendant–
Third–Party Plaintiff–Appellee.

Nos. 92–35061, 92–35144, 92–35145,
92–35148, 92–35149, 92–35152.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 7, 1993.

Opinion Filed Sept. 23, 1993.

Amending Order Filed Jan. 13, 1994.

Opinion Withdrawn April 28, 1994.

Filed April 28, 1994.

As Amended Aug. 30, 1994.

Peter A. Wald and M. Laurence Popofsky, Heller, Erhman, White & McAuliffe, San Francisco, CA, for defendant-third-party plaintiff-appellant ASARCO, Inc.

Jeffrey W. Leppo and Karen M. McGaffey, Bogle & Gates, Seattle, WA, for plaintiff-appellee Port of Tacoma.

Roger Clegg, Acting Asst. Atty. Gen., and Timothy J. Dowling, Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for the amicus curiae.

Before: WRIGHT, THOMPSON and KLEINFELD, Circuit Judges.

Opinion by Judge DAVID R. THOMPSON

## ORDER

The opinion filed September 23, 1993 and published at 6 F.3d 1332 (9th Cir.1993), and the order amending that opinion filed January 13, 1994 and published at 13 F.3d 1378 (9th Cir.1994) are withdrawn. The following opinion, which includes further amendments, replaces the opinion filed September 23, 1993 and the order filed January 13, 1994.

## OPINION

DAVID R. THOMPSON, Circuit Judge:

### OVERVIEW

This suit arises from the pollution of several sites near the Port of Tacoma ("the Port") by heavy metal contaminants leached from a slag and woodwaste mixture. ASARCO, Inc. ("ASARCO") produced the slag as a by-product of its smelting operations. ASARCO was found liable to the site owners and operators under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601–9626 (1988) ("CERCLA"); the Washington Hazardous Waste Management Act, Wash.Rev.Code Ann. § 70.105.005 et seq. (West 1992) ("the HWMA"); and the Washington Products Liability Act, Wash.Rev.Code Ann. § 7.72.010 et seq. (West 1992) ("the WPLA").

On appeal, ASARCO contends slag is excluded from CERCLA's definition of hazardous substances under the Bevill Amendment, and the jury's finding that slag was a product for WPLA purposes precluded a finding that it was a hazardous substance under the HWMA and CERCLA. It also argues the state statute of limitations had expired on all the state law claims.

ASARCO further contends the district court erred in denying its motion for sum-

mary judgment on the HWMA claims because its sales of slag occurred before the HWMA allowed a private cause of action, and the slag sales occurred at a time when Washington regulations excluded "materials in commerce" from the HWMA.

ASARCO also argues that the district court erred by imposing response costs against it under CERCLA for the cleanup of the site known as the "Portac site" because the claimants failed to comply with the National Contingency Plan ("the NCP"); awarding attorney fees and costs under CERCLA which are not recoverable under that statute; awarding loss-of-use damages under the WPLA for loss of use of the Portac site; and making various awards of attorney fees, costs, and prejudgment interest under state law.

Finally, ASARCO argues that it is entitled to a new trial because the district court erred in making rulings that affected the jury's verdict on the question of comparative fault. In support of this argument it contends the district court erred by refusing to admit evidence of the plaintiffs' violations of the permit requirements of the Clean Water Act, 33 U.S.C. § 1342(p) (1988); refusing to instruct the jury that evidence of violations of the Washington Water Pollution Control Act, Wash.Rev.Code Ann. § 90.48.010 et seq. (West 1992) ("the WPCA"), was evidence of negligence; and giving erroneous jury instructions under the HWMA.

The plaintiffs cross-appeal. They contend the district court erred in reducing their attorney fees under CERCLA by the percentage of comparative fault assigned to them. In addition, they contend the district court erred in determining that their nuisance claims were preempted by the WPLA and in dismissing their claims under the Washington Model Toxics Control Act, Wash. Rev.Code Ann. § 70.105D.010 et seq. (Amended 1993) ("the MTCA").

We have jurisdiction under 28 U.S.C. § 1291. We affirm the award of damages under CERCLA. We reverse the award of attorney fees under CERCLA, and the award of litigation expenses to the extent that award included expenses not recoverable as costs under 28 U.S.C. §§ 1821(b) and 1920. We also reverse the finding of liability under the HWMA, and the award of loss-of-use damages under the WPLA. We remand to the district court the question of when the statute of limitations began to run on the plaintiffs' WPLA claims. Because of a recent amendment to the MTCA, we reverse the district court's dismissal of the plaintiffs' claims under that statute. Although the damages recoverable under the MTCA might not exceed the damages recoverable under CERCLA, a question on which we express no opinion, attorney fees are recoverable under the MTCA. Accordingly, we remand the MTCA claims to the district court.

We reverse the district court's dismissal of the plaintiffs' intentional common-law nuisance claim We hold that although the WPLA preempts the plaintiffs' common-law nuisance claim based on allegations of negligence, it does not preempt the common-law nuisance claim based on allegations of intentional conduct, and we remand that claim to the district court.

## FACTS

ASARCO has been smelting copper from copper ore at its smelter near Tacoma since 1905. Smelting separates copper out of copper ore and produces large amounts of a byproduct called slag. For many years ASARCO dumped most of its slag into Commencement Bay. It had an agreement with the Metropolitan Park District of Tacoma to maintain a breakwater at that site.

In about 1973, ASARCO embarked on a plan to develop a market for its slag. It contracted with Black Knight, Inc. ("Black Knight") to take all of ASARCO's slag and resell what it could. Black Knight decided to market the slag for use as "ballast" in logyards. The logyards used the slag essentially like gravel, to provide firmer ground. This made the storage of logs and the opera-

tion of heavy equipment easier. The logyards would use a load of slag until it became too mixed together with woodwaste and other debris. They would then have it hauled away and put down a new load. Beginning in 1978, the six logyards involved in this suit hauled their slag/woodwaste to the B & L Landfill.

In 1980, the Environmental Protection Agency ("the EPA") found high concentrations of heavy metals in water runoff from one of the Murray–Pacific logyards. The EPA turned its findings over to the Washington Department of Ecology ("the WDOE"). The WDOE determined that slag was the likely cause of the contamination. Over the course of the next several years the WDOE sent letters, made phone calls, and held meetings with representatives of the affected sites, but it took no formal action. In 1986, WDOE began formally requiring cleanups. This case concerns who will bear the cost of these cleanups.[1]

The first party to file suit was Louisiana–Pacific Corp. ("Louisiana–Pacific"). It sued ASARCO for response costs for the cleanup of its logyard and for contribution or indemnity for its liability for the cost of cleanup of the B & L Landfill. It brought the suit under CERCLA. ASARCO counterclaimed against Louisiana–Pacific under CERCLA and state law.

ASARCO also brought third-party claims against several other logyards that had disposed of slag/woodwaste mix at the B & L Landfill. It also sued William Fjetland, the owner and operator of B & L Landfill and B

& L Trucking (which had transported the mix), and L–Bar Products, Inc. ("L–Bar"), which had bought assets of Industrial Mineral Products ("IMP"), the parent company of Black Knight. Some of these third-party defendants then counter-claimed against ASARCO asserting claims under CERCLA, the HWMA, the MTCA, and the WPLA. These parties also asserted common-law claims against ASARCO. The common-law claims included trespass, nuisance, negligence, negligent misrepresentation, fraud and breach of warranty.

The Port, which owned some of the logyard sites, then sued ASARCO for response costs under CERCLA and state law, and for indemnity and contribution for cleaning up the B & L Landfill. ASARCO filed counterclaims and cross-claims. Later ASARCO amended its third-party complaint in the Louisiana–Pacific action to include claims against another Fjetland company and IMP.[2]

On ASARCO's motion, the district court dismissed all the state common-law claims except trespass, on the ground that they were preempted by the WPLA. It also dismissed the MTCA claims because at that time the MTCA did not provide for a private cause of action.[3] Finally, the court dismissed ASARCO's claims against IMP and L–Bar.[4] The remaining state law claims (HWMA, WPLA and trespass) were tried to a jury. The CERCLA claims were tried to the court.

The jury found ASARCO liable to each plaintiff on both the WPLA and HWMA claims. The jury found no liability for trespass. The district court found ASARCO liable under CERCLA.

1. All of the sites listed below were contaminated by slag produced by ASARCO:

*Louisiana–Pacific site:* Owned and operated by Louisiana–Pacific.
*Portac site:* Owned by the Port of Tacoma; operated by Portac.
*Wasser & Winters site:* Owned by the Port of Tacoma; operated by Wasser & Winters.
*Cascade Timber site:* Owned by the Port of Tacoma; operated by Cascade Timber.
*Murray–Pacific #1 site:* Owned and operated by Murray–Pacific.
*Murray–Pacific #2 site:* Owned by the Port of Tacoma; operated by Murray–Pacific.
*B & L Landfill site:* Owned and operated by Fjetland. Contaminated by ASARCO slag dumped after use as ballast by Louisiana–Pacific, Portac, Wasser & Winters, Cascade Timber and Murray–Pacific. Eagle Trucking and B & L Trucking, both owned by Fjetland, transported the slag to the landfill.

With the exception of the B & L landfill, all the sites are logyards.

2. The suit begun by Louisiana–Pacific was consolidated with the one begun by the Port. The six logyards and the Port were realigned as plaintiffs with ASARCO as the only defendant. Fjetland and his companies remained third-party defendants. For the most part, the various plaintiffs act in concert in this appeal.

3. As discussed in following Part IV, the district court's holding on the MTCA claims was correct at the time. After oral argument in this appeal, however, the Washington legislature amended the MTCA to provide a private, and retroactive, cause of action. Act of May 12, 1993 ch. 70.-105D 1993 Wash.Laws Reg.Sess., Subst. Senate Bill no. 5404, sec. 1.

4. The claims against IMP and L–Bar are the subjects of separate appeals.

In the damage phase of the trial, the jury found ASARCO between 75% and 100% liable under state law for the cleanup costs at the various sites. The court found ASARCO between 79% and 100% liable for the cleanup costs at the sites under CERCLA. The court's assessment of comparative fault under CERCLA was higher for each site than the jury's state law assessment. The court then used the respective percentages to compute ASARCO's liability under state law and CERCLA for the "Portac" site, where remedial actions had been completed. It also awarded attorney fees under both CERCLA and the HWMA, and costs under both federal and state law. It reduced these fees and costs by the relevant comparative fault percentages. This appeal and cross-appeal followed.

## I

### CERCLA LIABILITY

ASARCO argues its liability to all plaintiffs under CERCLA should be reversed because slag contamination is excluded from CERCLA liability under the Bevill Amendment, and the jury's finding that slag is a product under the WPLA precluded a finding by the court that it was a waste under CERCLA. ASARCO further argues that the liability imposed on it for the cleanup of the Portac site should be reversed because the cleanup did not comply with the NCP. Finally, ASARCO argues that even if it is liable under CERCLA, the district court erred in awarding the plaintiffs attorney fees and costs.

A. Is slag a hazardous substance under CERCLA despite the Bevill Amendment reference in section 9601(14)(C)?

ASARCO contends that slag is excepted from the definition of "hazardous substance" under CERCLA, 42 U.S.C. § 9601(14). This section of the statute provides:

The term "hazardous substance" means (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any

5. The Bevill Amendment provides, in relevant part that

[n]otwithstanding the provisions of paragraph (1) of this subsection, each waste listed below shall, except as provided in subparagraph (B) of this paragraph, be subject only to regulation under other applicable provisions of Federal or State law in lieu of this subchapter until at least six months after the date of submission of

element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6921] *(but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of Congress)*, (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C. § 9601(14) (1988) (emphasis added). It is the underlined exception, which is a reference to the "Bevill Amendment" to the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq. (1988) ("the RCRA"), on which ASARCO relies.[5]

It is undisputed that slag is a material exempted from RCRA regulation under the Bevill Amendment. ASARCO contends the incorporation of this exemption into section 9601(14)(C) of CERCLA operates to except slag from CERCLA regulation as well. The EPA and the plaintiffs contend the exception in CERCLA § 9601(14)(C) merely prevents slag from being characterized as a hazardous substance under that particular subsection. They argue that if slag releases substances characterized as hazardous under subsections 9601(14)(A), (B), (D), (E) or (F), slag is subject to CERCLA regulation.

the applicable study required to be conducted ... and after promulgation of regulations in accordance with subparagraph (C) of this paragraph:

(i) Fly ash waste, bottom ash waste, *slag waste*,....

42 U.S.C. § 6921(b)(3)(A) (1988) (emphasis added).

This is a question of first impression in this circuit. The D.C. Circuit in *Eagle–Picher Indus., Inc. v. United States EPA,* 759 F.2d 922 (D.C.Cir.1985), concluded that the specific exception in subsection C applied only to that subsection and that mining wastes and fly ash were subject to CERCLA liability as hazardous substances under other subsections of section 9601(14). We agree with this approach.

The district court found that slag's components include copper, lead, arsenic and zinc. These are hazardous substances under subsections (A), (B) and (D) of section 9601(14). *See* 40 C.F.R. § 302.4 (listing copper, arsenic, lead and zinc under CERCLA § 102); 40 C.F.R. § 401.15 (listing copper, arsenic, lead and zinc under Clean Water Act § 307); 40 C.F.R. § 116.4 (listing arsenic trioxide under Clean Water Act § 311).

 It is sufficient for CERCLA regulation that a substance is covered by any of the subsections of section 9601(14). *Eagle–Picher,* 759 F.2d at 930. The fact that slag is excepted from subsection (C) by the Bevill Amendment has no bearing on whether slag in its component forms is excepted from the other subsections. If it were to be so excepted, logically a more general exception applicable to all of the subsections, or at least to those that would encompass slag by including its components, would have been used. This is what Congress did when it excepted petroleum products from all of the subsections by the general exception at the end of section 9601(14) which provides:

The term ["hazardous substance"] does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C. § 9601(14) (1988).

Had Congress intended to except slag from CERCLA regulation as it did petroleum products, it easily could have done so. It did not. It is clear from the plain language and structure of section 9601 that the specific exception for slag in subsection (C) applies only to that subsection and that slag is regulated by CERCLA to the extent that it falls under any other subsection of section 9601(14).

ASARCO argues the meaning of section 9601(14) is not plain from its language, and that the legislative history demonstrates the statute's ambiguity. It points to Senate Report 96–848, a report on a draft of CERCLA. This report states in pertinent part:

It should be noted that any substance or material for which regulation is specifically suspended by Act of Congress under the Solid Waste Disposal Act *is excluded from designation for the purpose of S. 1480, notwithstanding the presence in such substance of any hazardous or toxic chemical.*

Sen.Rep. No. 96–848, *reprinted in* The Environmental Law Institute, Superfund: A Legislative History, at 12 (emphasis added).

Assuming *arguendo* that section 9601(14) is ambiguous as ASARCO contends, any ambiguity has been laid to rest by the interpretation of the statute by the EPA, the agency charged with administering CERCLA.

When a court reviews an agency's construction of [a] statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; .... If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

ASARCO argues that under *INS v. Cardoza–Fonseca,* 480 U.S. 421, 445–49, 107 S.Ct. 1207, 1220–22, 94 L.Ed.2d 434 (1987), a question of pure statutory construction entitles the agency charged with enforcing the stat-

ute to no deference. While *Cardoza–Fonseca* might be read for this broad proposition, such a reading would create a direct conflict with *Chevron*. Moreover, the Court has explained the relationship between the two cases. In *NLRB v. United Food & Commercial Workers Union, Local 23, AFL–CIO*, 484 U.S. 112, 123, 108 S.Ct. 413, 416, 98 L.Ed.2d 429 (1987), it referred to both cases in determining the meaning of a statute without noting any conflict. It suggested that the result in *Cardoza–Fonseca* came from the first step of *Chevron's* two-step analysis. It said that the first step was to try "to determine congressional intent, using 'traditional tools of statutory construction.'" *Id.* The court went on, however, to cite *Chevron* for the proposition that if the first step failed, the agency's interpretation should be accepted if reasonable. *Id.*

The EPA has interpreted section 9601(14) to mean that the Bevill Amendment exception in subsection (C) refers only to that subsection. 48 Fed.Reg. 40663 (1983). The reasonableness of this interpretation is demonstrated by our analysis of what we have concluded to be the plain meaning of the statute. *See supra.*

ASARCO nonetheless argues we should hold that the EPA's interpretation of the statute is unreasonable because it would result in the complete nullification of the Bevill Amendment exception in subsection (C), an exception which specifically applies to slag. It points to the uncontradicted trial testimony of Dr. Twidwell, a doctor of metallurgical engineering with extensive experience. Dr. Twidwell testified that the components of all or virtually all Bevill Amendment wastes would fall under one of the other five categories of hazardous substances in section 9601(14). ASARCO argues Congress would not have enacted a meaningless provision of the statute. According to ASARCO, unless slag is entirely exempted from CERCLA by the Bevill Amendment exception in subsection (C), that exception is meaningless, because what the Bevill Amendment excepts from the statute in subsection (C) would be cancelled out by the inclusion of slag components in other subsections of section 9601.

ASARCO's argument is based on a false premise. It assumes that Congress meant for the statute to say something other than what it plainly says. What is clear is that Congress thought about an exemption for petroleum products and about hazardous wastes, including slag which is covered by the Bevill Amendment. Congress expressly provided a general exemption for petroleum products. It provided an exemption for slag only in subsection (C).

■ We hold that the specific exception for slag in subsection (C) of section 9601(14) of CERCLA applies only to that subsection and that slag and its components are regulated to the extent they fall within any of the other subsections of section 9601(14). Because the components slag leaches into the soil fall within at least one of the other subsections of section 9601(14), slag is regulated as a hazardous substance by CERCLA.

**B. If slag is a "product" under the WPLA, may it also be a "waste" under CERCLA?**

ASARCO contends that the jury's special verdict finding that slag was a "product" for purposes of the Washington Products Liability Act precludes the district court from finding that slag is a "waste" under CERCLA.

■ Washington law defines a product as "any object possessing intrinsic value, capable of delivery either as an assembled whole or as a component part or parts, and produced for introduction into trade or commerce." Wash.Rev.Code Ann. § 7.72.010(3) (West 1992). The jury, by its special verdict, determined that slag fit this definition. CERCLA, on the other hand, imposes liability on "any person who ... arranged for disposal or treatment ... of hazardous substances owned or possessed by such person...." 42 U.S.C. § 9607(a)(3) (1988). The issue raised by ASARCO is whether the sale of slag to the logyards can simultaneously be both the sale of a product with intrinsic value in trade or commerce under Washington law, and the disposal of a hazardous substance under CERCLA. We conclude that it can.

The WPLA and CERCLA address different concerns. The WPLA is a codification of the common law of products liability, with such changes as the Washington legislature thought appropriate. CERCLA is a federal law designed to facilitate the cleanup of waste that threatens the environment. A by-product of a metallurgical process, if sold, can be a product for purposes of one and waste for purposes of the other. This is especially so given that CERCLA is to be broadly interpreted to achieve its remedial goals. *3550 Stevens Creek Assoc. v. Barclays Bank*, 915 F.2d 1355, 1363 (9th Cir.1990), *cert. denied*, 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991).

District courts have concluded that CERCLA liability is possible for the disposal of wastes that are also products. *See, e.g., United States v. Conservation Chem. Co.*, 619 F.Supp. 162, 240–41 (W.D.Mo.1985) (sale of lime slurry and fly ash for cleanup of environmental site); *State of New York v. General Elec. Co.*, 592 F.Supp. 291, 297 (N.D.N.Y. 1984) (sale of used transformer oil to dragstrip for use in controlling dust); *United States v. A & F Materials Co., Inc.*, 582 F.Supp. 842, 844–45 (S.D.Ill.1984) (sale of caustic solution to neutralize acidic oil).

In *A & F Materials*, the district court was faced with the question whether the sale of spent "caustic solution," a by-product of the manufacture of jet aircraft, could subject McDonnell Douglas to CERCLA liability. McDonnell Douglas was able to sell the solution for 7.2¢ per gallon to A & F Materials which used it to neutralize acidic oil. *Id.* at 844. In deciding whether this was a waste disposal for CERCLA purposes, the court said "the definition of waste was intended to cover those hazardous materials which are of nominal commercial value and which were sometimes sold or reused and sometimes discarded." *Id.* The court concluded that the question whether the solution was a waste was a disputed issue of fact and that summary judgment was inappropriate. *Id.* at 845.

Slag, like the caustic solution in *A & F Materials*, is at best a by-product. ASARCO's principal business is the smelting of copper. McDonnell Douglas's principal business is the manufacture of aircraft. Both slag and the caustic solution are by-products with a nominal commercial value. The logging companies paid $3.50 per ton for slag, and preferred it to gravel as a "ballast." Similarly, A & F paid 7.2¢ per gallon for the caustic solution and used it to neutralize acidic oils. Both by-products were materials their producers wanted to get rid of whether they could sell them or not. ASARCO had dumped slag in Commencement Bay for years before that means of disposal became infeasible. McDonnell Douglas paid to have the caustic solution hauled away after A & F stopped buying it. We conclude that the jury's finding that slag was a product under the WPLA did not preclude the court from finding it was a waste under CERCLA.[6]

**C. The Portac Site and Substantial Compliance under the NCP**

Whatever ASARCO's liability may be for cleanup costs at other sites, it contends it should not be liable for the cleanup costs that were incurred by the Port and Portac in cleaning up the Portac site. ASARCO argues the cleanup of that site was not handled as required by 42 U.S.C. § 9607(a)(4)(B) (1988), the relevant portion of the NCP. Specifically, it contends that the Port and Portac failed to comply with the notice and comment provisions of the NCP before choosing a 30-inch gravel cap covered by 13 inches of compacted concrete spread over 30

---

**6.** ASARCO points to a number of cases in which courts have held that products were not waste for purposes of CERCLA or that sales were not disposal. *See, e.g., 3550 Stevens Creek Assoc. v. Barclays Bank*, 915 F.2d 1355 (9th Cir.1990), *cert. denied*, 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991); *Dayton Indep. School Dist. v. U.S. Mineral Products Co.*, 906 F.2d 1059 (5th Cir.1990); *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313 (11th Cir.1990).

These cases, however, involved products that were produced as the producers' principal business products, not by-products that the producers had to get rid of. Here, ASARCO's accounting manager responsible for devising a solution to the problem of slag accumulation described the dilemma facing ASARCO as follows: "Our life was hanging by a thread. There was a limited area for disposing of the slag. If you can't get rid of the slag, you are out of business."

acres, at a cost of nearly $5 million as the remedy for the Portac site.

█ 40 C.F.R. § 300.67(d) (1985) provided that

[i]n remedial actions ... feasibility studies that outline alternative remedial measures must be provided to the public for review and comment for a period of not less than 21 calendar days. Such review and comment shall precede selection of the remedial response. Public meeting(s) shall, in most circumstances, be held during the comment period.[7]

The district court found that the NCP was substantially complied with. Both parties concede that under our decisions in *Wickland* and *NL Indus.*, strict compliance is not required. *Wickland,* 792 F.2d at 891; *NL Indus.*, 792 F.2d at 898–99.

█ Initially, the parties disagree as to what standard of review we should apply in determining whether the district court erred in deciding that the Port and Portac substantially complied with the NCP. We hold that the issue of substantial compliance is a mixed question of law and fact. Its resolution involves the application of the law to a set of facts. Our review is de novo. *Boone v. United States,* 944 F.2d 1489, 1492 (9th Cir. 1991). To the extent, however, that specific factual findings made by the district court are in question, we review for clear error. Fed.R.Civ.P. 52(a); *SEC v. American Principals Holding, Inc. (In re San Vicente Medical Partners Ltd.),* 962 F.2d 1402, 1405 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 210, 121 L.Ed.2d 150 (1992).

█ Compliance here was not perfect, but it was substantial. The Port held six Port Commission meetings at which the cleanup of the Portac site was on the agenda. The fourth and fifth of these meetings are the most important. They occurred after Hart Crowser prepared a feasibility study outlining cleanup options for the Portac site. The Port received the study on June 17, 1988. The cleanup plan was on the agenda and discussed in at least two later meetings, on August 11 and September 22, 1988. These meetings and their agendas were well advertised, open to the public, and more than 21 days apart. The Crowser study was available for public examination at the Port's office.

ASARCO contends the Port and Portac had already decided on the paving option before the August 11th meeting, and consequently they did not comply meaningfully with the notice and comment provisions of the NCP. ASARCO points to references to the "Portac Paving" in a request for Port Commission action, and a reference to an agreement to pave the site in a letter written by the Port's chief engineer on August 2, 1988. The district court considered at some length the question whether the decision to pave was made before September 22, 1988 and found:

The final remedy was not chosen until the September meeting, as I understand what's before me. Certainly, from way back in the spring, the parties were pointing at paving, but it seems to me they were pointing at paving because that, from the beginning appeared to be the most likely result of this study. The evidence does not support the idea here, in my view, that all other alternatives were rejected out of hand before they were even made or when they were first made unreasonably in some way. I think ASARCO reads into some tentative decisions and tentative conclusions something that is not really there.

As I say, there is nothing wrong with focusing on what appears to be the best remedy early on, so long as you don't make the decision until the time for decision. That decision was not finally made until the September '88 Port meeting.

The district court's finding that the final decision on paving was not made until September 22, 1988 is a finding of fact which is not clearly erroneous. We have reviewed de novo the applicable law and the question of substantial compliance. We hold that the Port and Portac substantially complied with the NCP.

---

7. The NCP regulations applicable are those in effect at the time response costs are incurred. *Wickland Oil Terminals v. ASARCO, Inc.,* 792 F.2d 887, 891 (9th Cir.1986); *NL Indus. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). Here all parties concede that the 1985 regulations govern.

D. Did the district court err in awarding attorney fees and litigation expenses under CERCLA?

■ The district court awarded the plaintiffs their attorney fees and litigation expenses under CERCLA. After this appeal was filed, we held that attorney fees are not recoverable under CERCLA. *Stanton Road Ass'n v. Lohrey Enter.*, 984 F.2d 1015, 1020 (9th Cir.1993). The Supreme Court recently held the same, except for attorney fees "closely tied to the actual cleanup." *Key Tronic Corp. v. United States*, 114 S.Ct. 1960, 1967 (1994).

Neither we nor the Supreme Court has decided the question whether litigation expenses over and above the expenses recoverable under 28 U.S.C. §§ 1821(b) and 1920 may be recovered in a CERCLA action. *But see Key Tronic*, 114 S.Ct. at 1967 n.14. In the present case, the district court's award of litigation expenses totalled $436,705.31. This award included such items as travel, lodging, expert witness fees, long distance telephone calls and meals.

"[T]he full extent of a federal court's power to shift litigation costs absent express statutory authority to go further" is defined by 28 U.S.C. §§ 1821(b) and 1920. *West Virginia Univ. Hosp., Inc. v. Casey*, 499 U.S. 83, 86 (1991). Unless CERCLA permits the recovery of litigation expenses in excess of those recoverable under 28 U.S.C. §§ 1821(b) and 1920, the district court exceeded its authority in making its litigation expense award.

CERCLA authorizes private parties to recover "necessary costs of response...." 42 U.S.C. § 9607(a)(4)(B). CERCLA defines "response" as including "enforcement activities." *Id.* at § 9601(25). The plaintiffs argue that a private cost recovery action is an enforcement activity, making litigation expenses recoverable response costs. We disagree.

*Key Tronic* is instructive. There, in holding that attorney fees are not recoverable for bringing a cost recovery action under CERCLA, the Court stated that the phrase "enforcement activities" should not be construed "as encompassing the kind of private cost recovery action at issue in [that] case." *Key Tronic*, 114 S.Ct. at 1967. As in *Key Tronic*, the present litigation involves a private cost recovery action under CERCLA. Because bringing this litigation cannot be classified as an "enforcement activity" under CERCLA, the district court exceeded its authority to the extent its award of litigation costs exceeded those costs recoverable under 28 U.S.C. §§ 1821(b) and 1920.

II

HWMA LIABILITY

ASARCO challenges the imposition of liability under Washington's Hazardous Waste Management Act. While the award of cleanup costs under the HWMA is no longer in issue, because it is subsumed within the CERCLA award we have upheld, both attorney fees and prejudgment interest were awarded under the HWMA. ASARCO's liability for these items, attorney fees and prejudgment interest, is dependent on its liability under the HWMA.

ASARCO contends the judgment rendering it liable under the HWMA should be reversed. It argues the district court erred in refusing to grant its motion for summary judgment. The motion was based on the ground that the HWMA did not provide for a private cause of action at the time of the slag sales, and the amendment creating the private cause of action is not retroactive. It also argues the district court should have granted its motion for summary judgment because the jury's finding that slag was a product under the WPLA precluded a finding that it was also a hazardous waste under

the HWMA. ASARCO contends that even if we reject the previous two arguments, we should reverse the HWMA awards and remand for new findings because the district court erred by denying its motion for a directed verdict based on the state statute of limitations; using Washington's 1984 regulations to instruct the jury; refusing to admit evidence that the plaintiffs violated the federal Clean Water Act; refusing to instruct the jury that the plaintiffs' violation of the WPCA was evidence of negligence; and giving erroneous jury instructions under the HWMA.

■■■ Because we conclude the amendment to the HWMA that created a private cause of action may not be applied retroactively, we reverse the attorney fees and prejudgment interest awards under the HWMA and do not reach the other HWMA issues.

In applying the amendment retroactively, the district court relied on *Haddenham v. State of Washington*, 87 Wash.2d 145, 550 P.2d 9 (1976). In *Haddenham*, the family of two murder victims sued the State of Washington for negligently administering a sexual psychopath program from which the murderer escaped. The Washington Supreme Court considered whether the statute applied retroactively to preempt the plaintiffs' tort suit. *Id.* 550 P.2d at 12. It stated: "Statutes normally will be construed to operate prospectively only, unless a contrary intent appears.... Where, however, a statute is remedial and its remedial purpose is furthered by retroactive application, the presumption favoring prospective application is reversed." *Id.* at 12.

The HWMA, and particularly the private-cause-of-action amendment, Wash.Rev.Code Ann. § 70.105.097, are remedial. Nevertheless, we decline to extend the *Haddenham* reasoning to the HWMA.

The statute at issue in *Haddenham* did not become effective until approximately six months after the murder, but it provided for benefits to victims of crimes "on or after January 1, 1972" which was well before the murders. *Id.* The Washington court was at least encouraged in its conclusion by this provision of the statute. *Id.* There is no such retroactivity provision in the private-cause-of-action amendment to the HWMA.

Moreover, by "remedial" we do not understand the Washington Supreme Court to

have meant that retroactive application will be given to any statute that creates a remedy for some harm. The statute at issue in *Haddenham* was remedial in a different way from the amendment to the HWMA that created a private cause of action. In *Haddenham*, the Crime Victims Compensation Act, the statute in question, created "a comprehensive compensation plan for victims of crime incorporating the workmen's compensation benefit schedule." *Id.* at 11. The statute provided a public remedial scheme by which a recovery could be made against the state.

The amendment to the HWMA created a private cause of action for damages. Retroactive application of a public remedial scheme for recovery of compensation from the state does not affect private obligations as does a statute that creates a private liability for a private cause of action where none existed before. When a public remedial scheme is made retroactive, the legislature retroactively imposes liability on itself. When, in contrast, a new private cause of action is made retroactive, the legislature retroactively imposes liability on private parties. Thus, a court's inference that a public remedial scheme is intended to apply retroactively is much more reasonable than its inference that a new private cause of action is intended to apply retroactively.

Finally, we have held that the private cause of action under the RCRA, a federal statute analogous to the HWMA which the plaintiffs concede should be used to interpret the HWMA, does not apply retroactively. *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1159 (9th Cir.1989).

We conclude that the private-cause-of-action amendment to the HWMA does not apply retroactively.

The plaintiffs argue nonetheless that slag continues to leach hazardous substances into the soil, that this is an ongoing injury and that judgment was appropriately entered against ASARCO under the HWMA for this injury. We reject this argument.

No court has allowed a recovery for an ongoing injury under the HWMA. Cases that have allowed a recovery for ongoing contamination have done so under 42 U.S.C. § 6973(a) (1988), the provision of RCRA that gives the EPA administrator the power to enjoin persons from contributing to ongoing contamination. *See United States v. North-*

*eastern Pharmaceutical & Chemical Co., Inc.,* 810 F.2d 726, 740 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *United States v. Price,* 523 F.Supp. 1055, 1070–71 (D.N.J.1981), *aff'd,* 688 F.2d 204 (3d Cir.1982).

The provision of the HWMA at issue here is the private cause of action provision, more analogous to 42 U.S.C. § 6972 (1988). Cases addressing the ongoing violation theory under this provision have required that to be an ongoing violator, a defendant must own, or perhaps control, the property where seepage is taking place. *Cf. Fallowfield Dev. Corp. v. Strunk,* 1990 WL 52745, 1990 U.S.Dist. LEXIS 4820 (E.D.Pa.) (allowing RCRA cause of action where plaintiffs offered to show that defendants retained equitable ownership of property because its recent sale was fraudulent); *Coburn v. Sun Chem. Corp.,* 1988 WL 120739, 1988 U.S.Dist. LEXIS 12548 (E.D.Pa.) (denying RCRA cause of action because plaintiff no longer owned property).

■■■ The plaintiffs cite no section 6972 case imposing ongoing liability for a nonowner, and we have found none. ASARCO does not own or control the properties from which the slag/woodwaste mixture continues to leach hazardous substances. Because AS-ARCO would not be subject to a private RCRA suit for an ongoing violation, and because we look to the RCRA in interpreting Washington's HWMA, we conclude that AS-ARCO has no liability for an "ongoing violation" under the HWMA, and we reverse the judgment against it for attorney fees and prejudgment interest under that statute.

## III

### WPLA CLAIMS

ASARCO contends that we should reverse and remand the award of damages under the Washington Products Liability Act ("the WPLA"). It argues that the district court erred by rejecting its motion to dismiss on statute of limitations grounds; refusing to admit evidence of the plaintiffs' violation of the Clean Water Act; refusing to instruct the jury that the plaintiffs' violations of the WPCA was evidence of negligence; and giving erroneous HWMA jury instructions

which impacted the comparative fault calculations. In addition, ASARCO contends that loss-of-use damages were improperly awarded under the WPLA because they are not available as a matter of law. We address the last of these contentions first.

A. Did the district court err in allowing Portac to recover damages for loss of use under the WPLA?[8]

■■■ We agree with ASARCO that the WPLA precludes a recovery of damages for loss of use of property. *Washington Water Power Co. v. Graybar Elec. Co.,* 112 Wash.2d 847, 774 P.2d 1199, 1205 (1989), *amended* 779 P.2d 697.

In *Washington Water Power Co.,* the Washington Supreme Court analyzed the provision of the WPLA that defines "harm" as "any damages recognized by the courts of this state: *Provided,* That the term 'harm' does not include direct or consequential economic loss under Title 62A RCW." Wash. Rev.Code Ann. § 7.72.010(6) (West 1992). While *Washington Water Power Co.* is not directly on point because it dealt with what damages are available when a defective product harms only itself, some of the court's dicta is instructive.

First, the court noted that the WPLA was intended to "restrict product liability plaintiffs to contract remedies for economic loss." *Washington Water Power,* 774 P.2d at 1205. The damages at issue here, for loss of use of a site, resemble contract theory consequential damages. *See* Wash.Rev.Code Ann. § 62A.2–715(2). More important, however, the Washington Supreme Court noted approvingly that "[t]he common understanding of Washington commentators is that the WPLA also … overrul[es] this court's decision in *Berg v. General Motors Corp.,* 87 Wash.2d 584, 555 P.2d 818 (1976)." *Washington Water Power,* 774 P.2d at 1205 (footnote omitted). *Berg* involved damages indistinguishable in nature from the damages here. In *Berg,* a fisherman had purchased an engine which broke down repeatedly. *Berg,* 555 P.2d at 819. He sued requesting, among other things, the profits he lost as a result of his boat's downtime. The Washington Supreme Court held that the fisherman

---

**8.** The plaintiffs argue that ASARCO waived this argument by not raising it at trial. A review of the record shows, however, that ASARCO orally objected to loss-of-use damages. In addition, in its briefs in the district court it argued that economic damages were not recoverable under the WPLA.

had a product liability cause of action for these loss-of-use damages. *Id.* at 822–25.

■ If *Berg* is an example of the sort of damages the WPLA made unrecoverable in a tort action, the loss-of-use damages here are not recoverable under that statute. As in *Berg*, this case involves (for WPLA purposes) the sale of a defective product, slag. Also as in *Berg*, the harm that resulted prevented the plaintiff from operating his normal business, here a logyard. *Berg* allowed loss-of-use damages, essentially lost profits that would have been earned if the boat had been running. Here Portac asks for similar damages for loss of use of the site, lost profits and costs associated with shifting operations to other sites. The WPLA overruled *Berg*. It precludes the loss-of-use damages awarded here.

## B. Remaining Damages Under the WPLA

Except for the damages awarded to Portac for loss of use of the Portac site, all damages awarded under the WPLA are subsumed within the CERCLA award which we have upheld. Nevertheless, we must determine whether the WPLA damage awards were proper, because the district court awarded the plaintiffs prejudgment interest on these awards at the state law rate, which is greater than the federal rate.

ASARCO challenges the WPLA damage awards on the ground that the WPLA claims are barred by the applicable three-year statute of limitations.

The first lawsuit against ASARCO was filed by Louisiana–Pacific on May 11, 1988. The district court determined that the WPLA causes of action did not accrue until 1986, when the Washington Department of Energy ("WDOE") notified the various plaintiffs that they had to clean up their properties. The district court concluded the WPLA claims were not barred by the statute of limitations.

ASARCO argues the statute of limitations began to run when the plaintiffs first discovered, or should have discovered, their properties were damaged by ASARCO's slag. There was evidence the plaintiffs had meetings with, and calls and letters from, the WDOE concerning the contamination of their properties from slag as early as 1981.

■ We look to Washington state law to determine when the statute of limitations began to run on the WPLA claims. In *North Coast Air Serv., Ltd. v. Grumman Corp.*, 111 Wash.2d 315, 759 P.2d 405 (1988), the Washington Supreme Court held that in products liability actions, a cause of action accrues when a claimant discovers, "or in the exercise of due diligence should have discovered, a factual causal relationship of the product to the harm." *Id.* at 319, 759 P.2d at 407. Stated differently, the statute of limitations begins to run when a claimant first learns, or should have learned, of the essential elements of the possible cause of action. *Rose v. A.C. & S., Inc.*, 796 F.2d 294, 296 (9th Cir.1986); *Ohler v. Tacoma General Hosp.*, 92 Wash.2d 507, 511, 598 P.2d 1358, 1360 (1979). Where a claimant "has notice of facts sufficient to prompt a person of average prudence to inquire," the claimant "is deemed to have notice of all facts which reasonable inquiry would disclose." *Virgil v. Spokane County*, 42 Wash.App. 796, 800, 714 P.2d 692, 695 (1986). Just when a claimant knows or should know the elements of its cause of action is a question of fact. *North Coast Air*, 111 Wash.2d at 319, 759 P.2d at 407.

■ The essential elements of a products liability claim under Washington law are duty, breach of duty, causation, and damage or injury. *Rose*, 796 F.2d at 296; *Hibbard v. Gordon, Thomas, Honeywell, Malanca, Peterson and O'Hern*, 118 Wash.2d 737, 747, 826 P.2d 690, 695 (1992); *Ohler*, 92 Wash.2d at 511, 598 P.2d at 1360. Here, the district court held that the statute of limitations began to run when the DOE ordered the plaintiffs to clean up their properties, not when they first learned their properties were contaminated by ASARCO's slag. The district court reasoned that until the plaintiffs were required to incur response costs, they were unaware of the damages they had suffered under the WPLA and of the injury to their properties. We disagree.

■ In assessing the damage element, the statute of limitations begins to run when the claimant first discovers, or should have discovered, some damage, not necessarily the full extent of the damage:

"Where an injury, although slight, is sustained in consequence of the wrongful act of another, and the law affords a remedy therefor, the statute of limitations attaches at once. It is not material that all the damages resulting from the act shall have been sustained at that time, and the

running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date." [citations omitted]

*Steele v. Organon, Inc.,* 43 Wash.App. 230, 234, 716 P.2d 920, 922 (1986). *See also Zaleck v. Everett Clinic,* 60 Wash.App. 107, 802 P.2d 826 (1991).

The full extent of damage or loss need not be known, so long as the claimant is aware of some injury; "it is uncertainty as to the *fact* of damage, rather than its *amount,* which negatives the existence of a cause of action. Moreover, neither the speculative nor uncertain character of damages nor the difficulty of proof will toll the period of limitation." *Steele,* 43 Wash.App. at 235, 716 P.2d at 923; *see also Zaleck,* 60 Wash.App. 107, 802 P.2d 826 (plaintiff suffered damage sufficient to trigger the limitations period when his thumb became numb following an injection, not when he later learned he had suffered a permanent partial disability in his thumb).

Although no Washington case has decided this issue in the context of contaminated property, other courts have concluded that an injury to property occurs when a landowner first learns its property is contaminated. In *Edward Hines Lumber Co. v. Vulcan Materials Co.,* 669 F.Supp. 854 (N.D.Ill., 1987), Hines Lumber filed suit for CERCLA and common law negligence and product liability damages against a variety of defendants. *Id.* at 855. All defendants sold chemicals to Hines Lumber which it used in wood treatment and processing. *Id.* at 855–56. The chemicals allegedly caused environmental damage and Hines sued for its expected future damages. *Id.* Among other things, the defendants contended Hines failed to file suit within the state law statute of limitations. Although no costs of clean up had yet been incurred, Hines had sold the property and suffered a diminution of its value as a result of its contamination. The district court ignored the fact that no response costs had been incurred, and looked exclusively to the time Hines first learned its property had been damaged, to determine when its state causes of action accrued. *See also Montana Pole & Treating Plant v. I.F. Laucks and Co.,* 775 F.Supp. 1339 (D.Mont.1991) (statute of limitations commenced when owners knew waste preservative caused environmental damage, not when EPA seized the property); *CAMSI v. Hunter Technology Corp.,* 230 Cal. App.3d 1525, 282 Cal.Rptr. 80 (1991).

We find the reasoning of these cases persuasive and apply it to the WPLA claims of the landowners. Here, the landowners knew their properties were damaged when they first began receiving notices from the WDOE. They obviously knew at that time the values of their properties were likely diminished, regardless of future clean up costs the WDOE might require.

■ We conclude the landowners' claims under the WPLA accrued when they became aware, or should have become aware, of the contamination of their properties. It is uncertain when this occurred, although ASARCO contends it occurred as early as 1981. This is a factual question which should be addressed on remand.

■ The statute of limitations analysis for the lessees' WPLA claims differs somewhat. Under Washington law, only "actual and appreciable harm" triggers the limitations period. *Steele,* 43 Wash.App. at 233, 716 P.2d at 922. Unlike landowners, lessees do not necessarily suffer actual and appreciable harm when the market value of the underlying fee is diminished by contamination. A lessee of property may be able to enjoy the full intended use of the unexpired leasehold estate despite contamination. Whether a lessee suffers actual and appreciable harm as a result of contamination may depend upon such variables as the length of the unexpired term of the leasehold estate, whether the lessee has rights of assignment and subletting, the extent of the contamination as it affects the lessee's use of the property and other relevant considerations. We cannot determine from the record before us whether the lessees here suffered actual and appreciable harm and if they did when that occurred. Accordingly, we remand to the district court the question whether the lessees suffered actual and appreciable harm as a result of the contamination, and if so when the statute of limitations periods began to run for each of the lessees who suffered such harm.

We do not reach the question whether the WPLA damages sought by the plaintiffs are sufficiently liquidated to support an award of prejudgment interest under Washington law.

■ ASARCO also argues that the district court erred in finding the Port of Taco-

ma immune from the effect of the statute of limitations by virtue of its status as a sovereign entity. ASARCO contends the Port acted in a proprietary manner in leasing the logyards. Under Washington law, a statute of limitations does not run against a sovereign entity when actions are "brought in the name or for the benefit of the state. . . ." RCW 4.16.160.

■■■ "[M]unicipal actions are 'brought for the benefit of the state' when those actions arise out of the exercise of powers traceable to the sovereign powers of the state which have been delegated to the municipality." *Washington Public Power Supply System v. General Elec. Co.*, 113 Wash.2d 288, 293, 778 P.2d 1047, 1049 (1989) (en banc). In determining whether the Port's activity was sovereign or proprietary, "we may look to constitutional or statutory provisions indicating the sovereign nature of the power, and we may consider our traditional notions of powers which are inherent in the sovereign. Relevant to this analysis are the general powers and duties under which the municipality acted, the purpose of those powers, and whether the activity or its purpose is normally associated with private or sovereign concerns." *Id.* at 296, 778 P.2d at 1051.

■■■ Applying these criteria to the case at hand, we hold that the Port of Tacoma acted in a sovereign capacity in leasing the logyards. The Washington Constitution provides that areas designated by the port commission, up to 2000 feet from the harbor line, "shall be reserved for landings, wharves, streets, and *other conveniences of navigation and commerce.*" Wash. Const. Art. XV, § 1 (emphasis added). The Constitution also specifically provides for the leasing of these areas. *Id.* at § 2. We read the phrase "other conveniences of navigation and commerce" to include logyards. Washington statutory law also contemplates the development of "commercial transportation, transfer, handling, storage and terminal facilities, and industrial improvements" by the port districts. RCW 53.04.010. The port districts may lease these properties "for such purposes and upon such terms as the port commission deems proper." RCW 53.08.080.

Furthermore, we find it important that in leasing the property the Port did not act as a private party would act, leasing the land to any party offering the best terms. Instead the Port leased the property for logyards and subject to certain conditions designed to further harbor development. In leasing the logyards, the Port implemented part of its comprehensive harbor improvement plan. Non-monetary concerns motivated the Port in leasing the property, supporting the Port's contention that the action was more sovereign than proprietary. Because the Port acted in its sovereign capacity in leasing the logyards, the statute of limitations does not run against it.

## IV

### MTCA LIABILITY

The plaintiffs, with the exception of Louisiana–Pacific,[9] argue we should reverse the district court's dismissal of their claims under the Washington Model Toxics Control Act, Wash.Rev.Code Ann. § 70.105D.010 et seq. (Amended 1993). The district court dismissed the MTCA claims because it concluded the MTCA did not create a private cause of action, a holding which was later confirmed by the Washington Supreme Court. *See Bird–Johnson Corp. v. Dana Corp.*, 119 Wash.2d 423, 833 P.2d 375 (1992). During the pendency of this appeal, the Washington legislature amended the MTCA to overturn *Bird–Johnson.* The plaintiffs brought this to our attention as authorized by Federal Rule of Appellate Procedure 28(j). Pursuant to our order, the parties filed supplemental briefs addressing the question whether the recent amendment to the MTCA should be applied retroactively to permit the plaintiffs to pursue their MTCA claims.

The amended statute provides that

Except as provided in RCW 70.105D.040(4)(d), a person may bring a private right of action, including a claim for contribution or for declaratory relief, against any other person liable under RCW 70.105D.040 for the recovery of remedial action costs. . . . Remedial action costs shall include reasonable attorneys' fees and expenses. . . . This section applies to all causes of action regardless of when the cause of action may have arisen. To the extent a cause of action has arisen prior to the effective date of this act, this section applies retroactively, but in all other respects it applies prospectively.

---

9. Louisiana–Pacific did not allege a claim under the MTCA in the district court.

Act of May 12, 1993 ch. 70.105D 1993 Wash. Laws Reg.Sess., Subst. Senate Bill no. 5404, sec. 1.

▇▇▇ The amended MTCA clearly creates a private right of action, and makes it retroactive to cover harms that have already occurred. ASARCO argues that the MTCA amendment was not intended to be retroactive to cases already decided by the trial court and pending on appeal. We reject this argument. When the legislature determines that the policy underlying a statute is so important that the statute will be applied retroactively, there is no logical reason not to apply the statute to cases currently before the court. Moreover, the general rule in Washington is that statutes that are retroactive apply to pending litigation. *See, e.g., Seek Sys., Inc. v. Scully–Walton, Inc.,* 55 Wash.App. 318, 777 P.2d 560, 562 (1989), and the law applicable on appeal is the law at the time the appellate court issues its decision. *Bradley v. Richmond School Bd.,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); *DeGurules v. I.N.S.,* 833 F.2d 861, 863 (9th Cir.1987). The amended statute, therefore, provides a private cause of action to the plaintiffs.

▇▇▇ ASARCO contends the plaintiffs have waived any right to assert claims under the MTCA because they failed to argue in their appellate briefs (except in the supplemental briefing which we ordered) that the district court erred in dismissing their MTCA claims. We reject this argument.[10]

In *DeGurules,* we considered substantially the same question. There, the INS relied on *I.N.S. v. Phinpathya,* 464 U.S. 183, 104 S.Ct. 584, 78 L.Ed.2d 401 (1984), in ruling that petitioners were deportable because they had not met 8 U.S.C. § 1254(a)(1)'s seven-year strictly continuous physical presence requirement. Before we issued our decision in *De-Gurules,* however, Congress overturned *Phinpathya* by amending section 1254 to provide that "brief, casual, and innocent" absences from the United States would not prevent a finding that presence was continuous. 8 U.S.C. § 1254(b)(3). Even though the petitioners had not argued on appeal that

they could be allowed "brief, casual, and innocent" absences, we held that they had not waived this argument. *DeGurules,* 833 F.2d at 863. We applied the new law retroactively. *Id.* at 864.

The *DeGurules* analysis applies with equal force here. The plaintiffs filed timely notices of appeal from the district court's dismissal of their MTCA claims, but when the propriety of the district court's ruling was confirmed by the Washington Supreme Court in *Bird–Johnson,* they did not challenge the district court's ruling in their appellate briefs. At the time it would have been foolish for them to do so. When the Washington legislature changed the law, however, the plaintiffs promptly brought this to our attention, we ordered supplemental briefing, and both sides have now had a full and fair opportunity to brief the merits of their respective positions.

In these circumstances, we conclude the plaintiffs have not waived the right to challenge the dismissal of their MTCA claims. The district court dismissed those claims on the sole ground that the MTCA did not provide a private right of action. The district court did not consider the merits of the claims or whether there was any other impediment to the plaintiffs pursuing them. If the plaintiffs are entitled to prevail on their MTCA claims, attorney fees are recoverable.

We reverse the district court's dismissal of the MTCA claims. We remand to it the question whether the plaintiffs are entitled to prevail on those claims and, if so, what damages, attorney fees, prejudgment interest and other recovery they may be entitled to.

V

PLAINTIFFS' OTHER CROSS–APPEALS

▇▇▇ In their cross-appeal, the plaintiffs argue that the district court erred in reducing the amount of attorney fees awarded to them under CERCLA. Attorney fees for bringing a cost recovery action are not recoverable under CERCLA. *Key Tronic,* —— U.S. at ——, 114 S.Ct. 1967; *Stanton Road,* 984 F.2d at 1020. This contention is moot.

10. ASARCO also argues that because the district court's dismissal of the MTCA claims was a "final" order, claim preclusion applies and prevents the plaintiffs from re-raising these claims on appeal. This argument lacks merit. The district court's dismissal order was "final" for purposes of appeal. The plaintiffs timely filed notices of appeal from that order. The question is not one of claim preclusion but rather whether the plaintiffs waived their right to appeal from the dismissal of their MTCA claims by not challenging that dismissal in their initial briefs filed with this court.

 The plaintiffs also contend the district court should not have dismissed their common-law nuisance claims. The plaintiffs base these claims on allegations of negligent and intentional conduct. While the WPLA broadly preempts many common-law remedies, it expressly excludes claims based on "intentionally caused harm." Wash.Rev. Code Ann. § 7.72.010(4) (West 1992). This exclusion applies to the plaintiffs' intentionally caused nuisance claim. The WPLA preempts the plaintiffs' common-law nuisance claim based on allegations of negligent conduct, but it does not preempt the common-law nuisance claim based on allegations of intentional conduct.

 Nor are damages which may be recoverable on the intentional nuisance claim subsumed within the CERCLA recovery. Washington law provides for the recovery of "the loss of use or of income [from the land] for a reasonable time pending such restoration." *Colella v. King County*, 433 P.2d 154, 158 (Wash.1967). On remand the district court should determine whether ASARCO's conduct constituted an intentional nuisance under Washington law and, if so, what damages are recoverable.

### CONCLUSION

We affirm the district court's award of damages under CERCLA. We reverse the district court's award of attorney fees under CERCLA, and its award of litigation expenses to the extent its award included items not recoverable as costs under 28 U.S.C. §§ 1821(b) and 1920. We also reverse the finding of liability under the HWMA, and the award under it of cleanup costs, attorney fees, costs, and prejudgment interest. We remand to the district court the question whether the plaintiffs' claims under the WPLA are barred by the statute of limitations, and if not, whether the plaintiffs' claims under the WPLA are sufficiently liquidated to support an award of prejudgment interest under Washington law. We affirm the district court's ruling that the statute of limitations does not run against the Port of Tacoma. We reverse the district court's dismissal of the MTCA claims and remand those claims to the district court for further proceedings consistent with this opinion. We reverse the award of loss-of-use damages under the WPLA. We do not reach the award of damages and costs under the WPLA because they are subsumed within the CERCLA award which we uphold. We remand to the district court the issue whether ASARCO's conduct constituted an intentional nuisance and, if so, what damages are recoverable.

The plaintiffs/appellees shall recover two-thirds of their costs on appeal from ASARCO. The parties shall otherwise bear their own costs on appeal.

AFFIRMED in part, REVERSED in part, and REMANDED in part.

The opinion filed September 23, 1993 and published at 6 F.3d 1332, and the order amending that opinion filed January 13, 1994 and published at 13 F.3d 1378, have been withdrawn. A new opinion further amending the withdrawn opinion and order has been filed. With the filing of this new opinion, the petition for rehearing filed January 26, 1994 by Portac and Wasser & Winter, and the petition for rehearing filed January 27, 1994 by ASARCO, are DENIED.

The motion filed March 7, 1994 by Portac and Wasser & Winter to file a reply brief in support of their petition for rehearing is GRANTED. Their reply brief, presented with their motion of March 7, 1994, is ORDERED FILED.